**B**

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                                         SUPERIOR COURT DEPARTMENT
                                                      C.A. NO.

ACADIA HEALTHCARE COMPANY, INC.
AND HABIT OPCO, LLC,

      Plaintiffs

v.

CITY OF FITCHBURG, FITCHBURG                          COMPLAINT AND DEMAND FOR
ACTING BUILDING COMMISSIONER                          JURY TRIAL
FELIX ZEMEL, CITY OF FITCHBURG
ZONING BOARD OF APPEALS and its
members LAUREN McNAMARA,
MICHAEL O'LAUGHLIN, CHRISTINE
TREE, BRIAN GALLAGHER and GREG
BABINAEU,

      Defendants

I.    INTRODUCTION

1. This matter involves an ongoing pattern of discriminatory actions taken by officials of the

    City of Fitchburg ("City") that have repeatedly delayed and impeded attempts by the

    Plaintiffs, Acadia Healthcare Company, Inc., and its subsidiary Habit Opco, LLC

    (collectively, "Acadia") to provide outpatient treatment services for individuals suffering

    from opioid use disorder.  This discriminatory conduct began in 2021, when the City

    amended its zoning ordinance to require a discretionary special permit for clinics such as

    those operated by Acadia after Acadia consulted with various City officials regarding its

    intent to relocate its clinic at 155 Airport Road (the "Airport Road Site") to an existing

    medical building at 370 Lunenburg Street (the "Lunenburg Street Site").  The Fitchburg

Zoning Board of Appeals (the "ZBA") thereafter denied Acadia's request for a special permit in a decision filed with the Fitchburg City Clerk on or about August 31, 2021.

2. This pattern of discrimination has continued to this day. Specifically, the City's Acting Building Commissioner has now denied Acadia's application for a building permit to renovate its existing clinic at the Airport Road Site, determining without any justification that the clinic constitutes an "Ambulatory Care Facility" and that the purely interior renovations proposed by Acadia cannot be undertaken without satisfying costly and impracticable requirements that apply to such facilities.

3. These acts by the City and its instrumentalities had both the intention and effect of discriminating against the Acadia and its patients in violation of the Fourteenth Amendment to the United States Constitution, the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* (the "Rehabilitation Act"), the state Zoning Act, G.L. c.40A, §3, and the state anti-discrimination statute, G.L. c.151B.

II.    PARTIES

4. Plaintiff Acadia Healthcare Company, Inc. is foreign corporation with a principal office at 6100 Tower Circle, Suite 100, Franklin, TN 37067.

5. Plaintiff Habit Opco, LLC is foreign limited liability company with a principal office at 6100 Tower Circle, Suite 100, Franklin, TN 37067.

6. Defendant City of Fitchburg ("City") is a municipal corporation with a principal place of business at 166 Boulder Drive, Suite 108, Fitchburg, Massachusetts.

7. Defendant Felix Zemel is the Acting Building Commissioner of the City.

8. Defendant Fitchburg Zoning Board of Appeals ("ZBA") is a duly constituted board of the City, established pursuant to G.L. c.40A, §12.

9. Defendants, Lauren McNamara, Michael McLaughlin, Christine Tree, Brian Gallagher, and Greg Babineau were the members of the ZBA at the dates of the public hearing and issuance of the ZBA's decision to deny Acadia a special permit, filed with the City Clerk on or about August 31, 2021.

III.    STATEMENT OF FACTS

A.    The Opioid Crisis and Acadia's Mission

10. For many years, Opioid Use Disorder ("OUD") has wreaked havoc on public health and safety in communities across the United States, with more than 81,000 fatal opioid overdoses estimated in the United States in 2023, according to the Centers for Disease Control, National Center for Health Statistics.

11. Also in 2023, there were over 2,100 opioid-related deaths in Massachusetts alone, according to the Massachusetts Department of Public Health.

12. The City itself experiences dozens of fatal opioid overdoses each year and hundreds of nonfatal overdoses.  It experiences a higher opioid fatality rate than surrounding communities, according to a grant application it submitted to the U.S. Department of Justice Bureau of Justice Assistance in 2021.

13. In an effort to recognize and combat this growing epidemic, on March 10, 2016, the United States Senate passed the Comprehensive Addiction and Recovery Act of 2016, which documented the abuse of heroin and prescription opioid painkillers as having "a devastating effect on public health and safety in communities across the United States," with the number of drug overdose deaths now surpassing the number of traffic accident deaths:

> According to the Centers for Disease Control and Prevention, drug overdose deaths now surpass traffic accidents in the number of deaths caused by injury in the United States. In 2014, an average of more than 120 people in the United States died from drug overdoses every day.

Comprehensive Addiction and Recovery Act of 2016, S.524, 114th Cong., § 2.

14. The opioid crisis was declared a National Emergency in 2017.

15. Acadia is a national healthcare company that provides counseling and medication assisted treatment ("MAT") for individuals recovering from OUD.

16. Acadia provides medically supervised treatment and counseling to patients recovering from opioid addiction on an out-patient basis.

17. Acadia's patients are protected under the ADA and the Rehabilitation Act.

18. Acadia's model incorporates a team of medical professionals, including physicians, therapists and clinicians who examine, test, counsel and treat patients on site.

19. Since 2001, Acadia has operated a counseling and treatment facility in the City at the Airport Road Site.

20. Acadia operates over 250 similar facilities across the country, including 16 in Massachusetts.

21. There is no record of traffic or law enforcement problems relating to Acadia's operations within the City. Nor is there any record of any problem with the ability of Acadia's patients to exit its facility during any alarm or other emergency.

### B. The Lunenburg Street Site

20. In late 2020/early 2021, Acadia approached City officials to discuss its intent to relocate its treatment facility from the Airport Road Site to the Lunenberg Street Site.

21. Acadia's lease of the Airport Road Site was soon to expire, and Acadia desired to relocate the facility to a location that was more convenient, accessible, comfortable and modern, in order to better serve its patients.

22. Shortly thereafter, the City amended its Zoning Ordinance.

23. The amended Zoning Ordinance for the first time required a special permit to operate a
    medical treatment center in the Commercial Zoning District, in which the Lunenburg Street
    Site is located.

24. Accordingly, on or about April 9, 2021, Acadia filed an application for a special permit to
    operate its clinic at the Lunenburg Street Site.

25. No City department or board submitted any comments to the ZBA expressing concerns
    regarding traffic or purported security problems regarding the proposed use of the Lunenburg
    Street Site.  At no time prior to the public hearing did any City official advise Acadia that
    traffic was a concern.

26. The Lunenburg Street Site exceeds the minimum lot size of 65,000 square feet required
    under Zoning Ordinance.  It also complies with the frontage, lot width, height, loading and
    parking requirements.

27. Acadia would be one of multiple tenants in an existing medical building containing
    approximately 18,830 square feet of gross floor area.

28. Pursuant to the Zoning Ordinance, one parking space per 400 square feet of gross floor area
    is required; therefore, 48 parking spaces are required for the existing building.  The
    Lunenburg Street Site contains 94 parking spaces.

29. The site is accessed by two curb cuts onto Lunenburg Street, both of which meet the
    requirements of the Zoning Ordinance.

30. The Lunenburg Street Site also meets the parking setback requirements of parking spaces
    being set back at least 3 feet from any lot line, sidewalk, or building, pursuant to the Zoning
    Ordinance.

31. It contains 33,598 square feet of landscaping, far exceeding the minimum of 2,322 square feet required pursuant to the Zoning Ordinance.

32. The Lunenburg Street Site does have a few minor zoning nonconformities, including drive aisle widths and the buffer area between the existing parking area and abutting residential district between the property. These features are lawfully preexisting nonconformities, which are protected, pursuant to G.L. c. 40A, §6 and Section 181.332 of the Zoning Ordinance. Upon information and belief, the City has never taken any enforcement action in connection with any medical use of the property based upon these or any other zoning nonconformity.

33. Acadia's use is entitled to special consideration under the ADA.

34. Moreover, patients receiving treatment from Habit Opco are considered persons with disabilities under the ADA. Pursuant to Section 12182 of the ADA:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

35. Section 12182(b)(2)(A)(ii) of the ADA provides that unlawful discrimination includes:

> A failure to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

36. The public hearing before the ZBA commenced on May 11, 2021, and was continued to June 8, 2021, when the public hearing was closed.

37. During the course of the public hearing, the ZBA accepted and agreed with numerous comments from neighbors, other tenants of the property and City officials expressing overtly

prejudiced and discriminatory views, including unfounded "concerns" regarding increased crime and other misbehavior of patients seeking treatment at the facility. As noted, Acadia has operated at its current facility in the City for decades without incident.

38. Other commenters noted that the Lunenburg Street Site is at the "gateway" of the City (on the boundary with the neighboring Town of Lunenburg) and questioned what kind of "message" it would send to have Acadia's clinic located on the municipal boundary.

39. The building on the Lunenburg Street Site is set far back from the public way, separated by landscaping and an expansive parking lot.

40. In contrast, a retail marijuana store is located directly across the street at 371 Lunenburg Street, in plain view of the public way.

41. During the course of the public hearing, members of the ZBA (including its chair), the City Council (including the son of the then Mayor) and others repeatedly and with open hostility demanded that Acadia justify its desire to relocate from the Airport Road Site. Such questioning was patently discriminatory. There is no requirement in the Zoning Ordinance or any other regulation that requires an applicant to justify its reasons for seeking to relocate a business. Upon information and belief such demands are not made of any other special permit applicants.

42. In any case, Acadia amply demonstrated why it sought to relocate its facility.

43. The new proposed facility would have been located on a 2.07 acre site, which is already improved with a 17,978 gross square feet single-story medical office building constructed in or about 1994 for Mallon Medical Center and ample parking.

44. In contrast, Acadia's facility at the Airport Road Site contains approximately 5,625 square feet of area, approximately 1,700 square feet of which is not ADA accessible.

45. Acadia would have occupied approximately 7,660 square feet of floor area at the Lunenburg
Street Site, an increase in interior area of over 36%.

46. Moreover, Acadia explained that costly renovations would be required at the Airport Road
Site to make it somewhat more efficient and handicap accessible, resulting in the loss of
additional usable square footage.

47. The Airport Road location provided just four stations for dispensing medication, and these
stations lack appropriate privacy enclosures for patients. In contrast, the facility at the
Lunenburg Street Site would have provided six stations, each with appropriate privacy
enclosures.

48. Additionally, the Airport Road Site contains only one safe for storage of medication, without
room to install a second. The significance of this deficiency cannot be overstated; the lack of
sufficient medication storage space is not consistent with standard practice and places patient
care at significant risk. The new facility at the Lunenburg Street Site, in contrast, would
contain two safes for adequate medication storage.

49. One of the most significant deficiencies in the Airport Road Site is the inadequacy of the
patient dispensary waiting area. The existing patient waiting area is only 688 square feet.
Patients have often been required to queue outside, in public view and subject to inclement
weather, in order to obtain treatment. The new facility would have allowed for a
significantly larger and more comfortable waiting area, and Acadia repeatedly agreed that it
would accept a condition prohibiting outdoor queuing.

50. Acadia further explained that the Airport Road Site had just 16 staff offices, two or three of
which would be lost as a result of required renovations, leaving just 13 or 14 offices. In
contrast, the proposed facility would have contained 24 offices for staff and patient

counseling, and the entire facility would have been on one level, so that patients with limited mobility would not be forced to use a wheelchair lift to access their treatment.

51. Nevertheless, the ZBA voted unanimously at the close of the public hearing to deny Acadia's Application.

52. The ZBA's Decision was filed with the City Clerk on or about August 31, 2021.

53. The ZBA Decision states:

> During both meetings, the Board received numerous comments via emailed letters and virtual participation, from neighbors, public officials, and medical professionals currently practicing at the Locus expressing their concern regarding this petition since this is a property bounded with residential neighborhoods on two sides. Objects included perceived safety, increased traffic, impaired driving, queuing, an influx of activity conflicting with the residential neighborhood, and visual impact on the City's commercial corridor.

54. These stated traffic concerns are unsupported, discriminatory and pretextual.

55. Acadia performed a substantial traffic study, the detailed findings of which were presented to the ZBA as part of its application, and its traffic engineer was present during the public hearing to address any questions regarding perceived traffic issues.

56. Acadia's traffic expert testified to the ZBA that numerous uses allowed by right under the Zoning Ordinance would produce substantially more traffic than the proposed use.

57. The Lunenburg Street Site is located on a heavily traveled commercial thoroughfare containing large box retailers and various other commercial and light industrial uses, and Acadia's proposal would not have resulted in any appreciable traffic impacts.

58. The ZBA ignored the well-reasoned findings of Habit Opco's traffic consultant, even though it failed to solicit or receive any traffic comments from an independent traffic consultant or the City's engineering or public safety departments.

59. The ZBA Decision also states:

In addition, several physicians practicing at the Locus, although valuing the services provided by the Petitioner, expressed concern about the proposed co-location of a medical treatment center, citing interactions with their patients, the effect of perceived safety issues on patient retention, difficulty in recruiting and retaining physicians to that location affecting continuation of medical services, and the proximity of a medical treatment center to a marijuana retailer.

60. This finding is overtly discriminatory and explicitly panders to the unfounded animus toward Acadia's patients expressed by residents and City officials during the ZBA's public hearing. Moreover, it ignored the facts that Acadia's application proposed construction of a dedicated entrance for its facility and that it repeatedly offered to accept a condition of approval that would prohibit any queuing whatsoever outside the proposed facility.

61. In addition to its request for a special permit, Acadia's submission to the ZBA explicitly requested a reasonable accommodation pursuant to the Americans with Disabilities Act ("ADA") and the Fair Housing Amendments Act ("FHAA").

62. The ZBA failed even to address Acadia's request for reasonable accommodations.

C.  The Airport Road Site

63. As a result of the ZBA's patently unlawful and discriminatory conduct, Acadia was forced to exercise a lease renewal at the Airport Road Facility, thereby precluding it from relocating and rendering an appeal of the ZBA Decision useless.

64. Instead, Acadia was forced to turn its attention to the costly, time-consuming and less efficient alternative of renovating the smaller Airport Road Site, which was the clearly intended result of the ZBA's discriminatory decision.

65. Acadia's clinic in the City serves patients who are in recovery from OUD and are fully capable of functioning in society. They hold jobs, run businesses, care for families and attend school.

66. Patients arrive at the clinic independently, receive their services and leave independently. Some drive to the clinic, some walk, and some take public or private transportation.

67. The treatment provided by Acadia does not in any way incapacitate patients or render them incapable of self-preservation. To the contrary, most patients receive their treatment in the morning and depart directly for work, school and their other daily activities.

68. Patient visits typically last fifteen minutes or less.

69. At no point during these visits would a patient be unable to evacuate the clinic under their own power in the case of an emergency.

70. Patients never so much as lie down in the clinic.

71. On or about January 29, 2024, Acadia applied for a building permit to conduct interior renovations to its facility intended to increase its accessibility, comfort and efficiency ("Renovation Project"). No expansion or exterior alterations are proposed.

72. On or about February 16, 2024, the Building Commissioner asked Acadia for "an explanation as to how this does not classify as a Use Group B Ambulatory Care Facility."

73. The Building Commissioner also suggested that Acadia would be required to obtain a special permit from the ZBA, even though Acadia has operated its clinic at the Airport Road Site since prior to the 2021 Zoning Amendment that created the special permit requirement and is therefore a lawfully preexisting nonconforming use.

74. As further set forth below, classifying Acadia's clinic as an Ambulatory Care Facility would impose costly and impracticable requirements that would further delay and potentially prevent Acadia from proceeding with its Renovation Project.

75. Pursuant to Section 202 of the Massachusetts Building Code, Ambulatory Care Facilities are defined as, "Buildings or portions thereof used to provide medical, surgical, psychiatric,

nursing or similar care on a less than 24-hour basis to individuals who are rendered incapable of self-preservation."

76. On February 19, 2024, Acadia's Architect responded, "The patients at this facility are not rendered incapable of self-preservation. Hence, this facility would not be categorized as an ambulatory care facility."

77. On or about February 23, 2024, Acadia's Regional Vice President further responded to the Building Commission's request, explaining that the MAT services provided at the clinic do "not render persons incapable of self-preservation by our services and furthermore, the facility does not assume the responsibility for the care of incapable individuals."

78. No reply was received from the Building Commissioner for over two months.

79. Accordingly, Acadia was forced to engage legal counsel, who issued a third written response, dated April 30, 2024, again explaining that, since none of the Clinic's patients are incapacitated or incapable of self-preservation either when they arrive at the Clinic or as a result of their treatment, the clinic cannot be considered an Ambulatory Care Facility. He also explained that no special permit could be required, since Acadia was not proposing to change or expand its preexisting nonconforming use.

80. Again, the Building Commissioner provided no response for over a month.

81. Finally, on June 5, 2024, the Building Commissioner issued a decision denying Acadia's application ("Building Commissioner Decision").

82. The Building Commissioner Decision is based solely upon a determination that the Clinic is an Ambulatory Care Facility.

83. The Building Commissioner Decision does not acknowledge or address Acadia's multiple and detailed submissions regarding the issue and provides no legal or factual basis for the determination that Acadia's clinic constitutes an Ambulatory Care Facility.

84. As noted above, the state Building Code defines Ambulatory Care Facilities as "Buildings or portions thereof used to provide medical, surgical, psychiatric, nursing or similar care on a less than 24-hour basis to individuals who are rendered incapable of self-preservation.

85. The Code provides the following definition of "incapable of self-preservation:"

> Persons who, because of age, physical limitations, mental limitations, chemical dependency or medical treatment, cannot respond as an individual to an emergency situation.

86. The term is more specifically defined by 104 CMR 28.14(1)(a), as follows:

> Self-preservation means the capability both mentally and physically to take action to preserve one's own life, specifically to egress the building in which one resides unassisted within 2 1/2 minutes.

87. The clinic operated by Acadia at the Airport Road Site clearly does not constitute an Ambulatory Care Facility.  None of Acadia's other clinics has ever been classified as an Ambulatory Care Facility

88. None of the counseling or treatment provided by Acadia "renders the patients incapable of taking action for self-preservation"—e.g., exiting the building in the event of a fire or other emergency.

89. It is apparent that the Building Commissioner unilaterally concluded that Acadia's patients are innately incapable of exiting the building without assistance in the event of an emergency simply because they are in recovery from OUD.  Such a conclusion is patently discriminatory and unfounded.

90. Acadia's patients are active members of the community, who choose to receive MAT at the clinic, often early in the morning so that they can continue with their normal daily activities, including going to jobs, attending school, and caring for family members.

91. Patients are not sedated or put under general anesthesia at the clinic. They arrive and leave under their own power, generally within a matter of minutes.

92. Simply put, this is not a facility in which individuals receive treatment that would make it difficult for them to evacuate in the event of an emergency.

93. Indeed, the Building Commissioner's discriminatory determination that Acadia's patients (unlike the patients of a chiropractor, dentist, physical therapist or other medical provider) are inherently incapable of self-preservation is not only factually unsupported, it is also contrary to the the Building Code itself, which recognizes that residents of alcohol and drug treatment facilities are indeed capable of self-preservation. See 780 CMR 310.6(1) (stating, in defining Group R-4 uses, "[t]he persons receiving care are capable of self-preservation. This group shall include, but not be limited to, the following: 1. Alcohol and drug centers…").

94. In addition, just as the ZBA failed to acknowledge or address Acadia's request for reasonable accommodations under the ADA and Rehabilitation Act when it denied Acadia's special permit application for the Lunenburg Street Site, the Building Commissioner likewise ignored Acadia's request for reasonable accommodations in denying its request for a building permit for the Renovation Project.

95. Acadia has appealed the Building Commissioner's Decision to the state Building Code Appeals Board, pursuant to G.L. c.143, §100.

96. As a result of the Building Commissioner's discriminatory conduct, Acadia has incurred unnecessary delay and expense in its efforts to undertake the Renovation Project—a project that Acadia was forced to undertake only as a result of the discriminatory conduct of the ZBA in denying its request for a special permit to relocate to the Lunenburg Street Site.

<u>COUNT I</u>
<u>VIOLATION OF AMERICANS WITH DISABILITIES ACT,</u>
<u>42 U.S.C. SECTION 12101, *et seq.*</u>

97. Acadia hereby incorporates by reference the allegations and facts set forth in paragraphs 1 through 96 as if fully restated herein.

98. The ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the service, program or activity of a public entity or be subjected to discrimination by such entity. The ADA makes it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding or discriminating against individuals with disabilities from, denying them benefits of, or otherwise subjecting them to discrimination. 28 C.F.R. §35.130(b)(4). Pursuant to Section 12132 of the ADA:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

99. Acadia's patients are persons recovering from or receiving treatment for addiction and are disabled individuals for purposes of the ADA. 42 U.S.C. §12102(2) and 28 C.F.R. §35.104.

100. The City, ZBA and Building Commissioner, are qualifying public entities within the meaning of the ADA pursuant to 42 U.S.C. §12131(1)(A).

101.    Pursuant to 42 U.S.C. Section 12182(b)(2)(A)(ii), prohibited discrimination under the

ADA includes:

> A failure to make reasonable modifications in policies, practices, or procedures, when
> such modifications are necessary to afford such goods, services, facilities, privileges,
> advantages, or accommodations to individuals with disabilities, unless the entity can
> demonstrate that making such modifications would fundamentally alter the nature of such
> goods, services, facilities, privileges, advantages, or accommodations…

102.    Acadia requested reasonable accommodations from the ZBA and the Building

Commissioner.

103.    The ZBA Decision expresses unsubstantiated concerns about traffic impacts from

Acadia's Application, which were nothing more than an illegal pretext to discriminate

against Acadia's patients with disabilities.

104.    Indeed, the ZBA did not even request a peer review of the traffic study offered by

Acadia, nor did it solicit or offer any independently verified traffic data before it voted to

deny the Application.

105.    Moreover, the ZBA acted with overt discriminatory intent, favorably accepting numerous

comments from members of the public and the City Council expressing manifest prejudice

against Acadia's patients, including unfounded allegations that the facility would result in

increased crime and other misbehavior, despite the lack of any evidence that Acadia's

existing facility has had any such effect in the decades it has operated in the City.

106.    The ZBA further accepted the statements of other medical tenants of the Lunenburg

Street Site that their patients—because of the pervasive prejudice against individuals

recovering from OUD—would be nervous and "scared off" if Acadia's Application were

approved.

107.   Astoundingly, the ZBA actually incorporated these patently discriminatory sentiments in

its decision.

108.   The Building Commissioner's denial of Acadia's request for a building permit to

renovate its clinic at the Airport Road Site, based upon his unfounded determination that

Acadia's patients are incapable of self-preservation, was similarly discriminatory.

109.   The aforementioned decisions of the ZBA and the Building Commissioner, as well as

their failure to respond to Acadia's requests for reasonable accommodations, violated the

ADA to the detriment of Acadia and its patients with disabilities.

### COUNT II
### VIOLATION OF REHABILITATION ACT OF 1973

110.      Acadia hereby incorporates by reference the allegations and facts set forth in

paragraphs 1 through 109 as if fully restated herein.

111.      The Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, provides that no qualified

individual with a disability shall, solely by reason of her or his disability, be excluded

from participation in or be denied the benefits of or be subjected to discrimination under

any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

112.      Upon information and belief, the City of Fitchburg receives federal financial

assistance, including without limitation through federal grant programs such as the

Community Development Block Grant program, which is funded by the U.S. Department of

Housing and Urban Development.

113.      Section 508 of the Rehabilitation Act defines "program or activity" as "all of the

operations of specific entities, including "a department, agency, special purpose district, or

other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

114.    Zoning and permitting decisions by a municipality are normal functions of a governmental entity and thus, are covered by the Rehabilitation Act.

115.    Acadia's patients are qualified persons under the Rehabilitation Act with disabilities that substantially impair one or more major life activities.

116.    The first criterion for treatment at Acadia's facility is that patients be diagnosed as suffering from OUD.

117.    While receiving treatment at Acadia's facility, patients are continually evaluated to ensure that patients are not using any illegal, controlled substances.  As a result, its patients are "qualified persons with disabilities" within the meaning of the Rehabilitation Act, 29 U.S.C. § 706(8)(C)(ii)(II).

118.    The City, ZBA and Building Commissioner are qualifying public entities within the meaning of the Rehabilitation Act.

119.    Section 508 of the Rehabilitation Act constitutes a general prohibition against discrimination on the basis of disability by public entities.

120.    The ZBA and the Building Commissioner have violated the Rehabilitation Act by, inter alia: (i) refusing to provide reasonable accommodations to the disabled individuals serviced by Acadia; (ii) allowing prejudice against disabled individuals to dictate the outcome of their zoning and permitting decisions; (iii) discriminating against disabled individuals; and (iv) failing to grant or even respond to Acadia's requests for reasonable accommodations.

<u>COUNT III</u>
<u>VIOLATION OF 42 U.S.C. § 1983</u>

121.    Acadia hereby incorporates by reference the allegations and facts set forth in paragraphs 1 through 120 as if fully restated herein.

122.    Acadia and its patients are members of a protected class.

123.    The defendants have treated Acadia differently from similarly situated applicants, who do

not serve patients recovering from OUD.

124.    The above-described actions of the defendants were taken under color of law and

constitute state action.

125.    The defendants' conduct was arbitrary, capricious, unreasonable, malicious,

discriminatory and in bad faith, and shocks the conscience.

126.    Accordingly, the defendants' actions violate the due process and equal protection clauses

of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

<u>COUNT IV</u>
<u>VIOLATION OF G.L. c.40A, §3</u>

127.    Acadia hereby incorporates by reference the allegations and facts set forth in paragraphs

1 through 126 as if fully restated herein.

128.    The above-described actions of the defendants violated the provisions of G.L. c. 40A, §3,

which states, in pertinent part:

> Notwithstanding any general or special law to the contrary, local land use and health
> and safety laws, regulations, practices, ordinances, by-laws and decisions of a city or
> town shall not discriminate against a disabled person. Imposition of health and safety
> laws or land-use requirements on congregate living arrangements among non-related
> persons with disabilities that are not imposed on families and groups of similar size or
> other unrelated persons shall constitute discrimination. The provisions of this
> paragraph shall apply to every city or town, including, but not limited to the city of
> Boston and the city of Cambridge.

<u>COUNT VI</u>
<u>VIOLATION OF G.L. c.151B</u>

129.    Acadia hereby incorporates by reference the allegations and facts set forth in paragraphs

1 through 128 as if fully restated herein.

130.    Pursuant to G.L. c. 151B, §4, it is unlawful "[f]or any person to directly or indirectly induce, attempt to induce, prevent, or attempt to prevent the sale, purchase, or rental of any dwelling or dwellings by: (a) implicit or explicit representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular age, race, color, religion, sex, gender identity, national or ethnic origin, or economic level or a handicapped person, or a person having a child, or implicit or explicit representations regarding the effects or consequences of any such entry or prospective entry…"

131.    All political subdivisions of the Commonwealth are "persons" for purposes of Chapter 151B.

132.    The statute defines the term "handicap" to mean "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment, but such term shall not include current, illegal use of a controlled substance as defined in section one of chapter ninety-four C."

133.    The defendants violated the rights of Acadia and its patients by exercising their powers to regulate land use in a way that discriminates against disabled persons without justification or cause.

<u>REQUESTS FOR RELIEF</u>

WHEREFORE, Acadia prays that this Honorable Court enter Judgment in its favor and against the Defendants, jointly and severally, and requests that the Court:

A.  Declare that the defendants' conduct violated the rights of Acadia and its patients under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983, the ADA, the Rehabilitation Act, G.L. c.40A, §3 and G.L c.151B.

B.  Award Acadia compensatory damages, including without limitation lost profits, lost opportunity and increased permitting costs.

C.  Award Acadia punitive damages based upon the defendants' willful and knowing violation of its civil rights.

D.  Award Acadia its costs, expenses and counsel fees.

E.  Enjoin the defendants from engaging in further discriminatory conduct against Acadia or its patients.

F.  Grant such other and further relief as the Court deems just.

<u>JURY DEMAND</u>

Acadia respectfully demands a trial by jury on all issues so triable herein.

Respectfully submitted,


PLAINTIFFS
By their attorney,


__*/s/ Jonathan M. Silverstein*_____
Jonathan M. Silverstein
BBO# 630431
Blatman, Bobrowski, Haverty & Silverstein, LLC
9 Damonmill Square, Suite 4A4
Concord, MA 01742
(617) 281-6913
jms@bbhslaw.net

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Massachusetts Trial Court Superior Court |
|---|---|---|

COUNTY

| | |
|---|---|
| **Plaintiff**   Acadia Healthcare Company, Inc. and Habit Opco, LLC | **Defendant:** ⌄   City of Fitchburg, Fitchburg Zoning Board of Ap Fitchburg Building Commissioner Felix Zemel, former Fitchburg Zoning Board of Appeals mer Lauren McNamara, Michael McLaughlin, Chris Brian Gallagher, and Greg Babineau |
| ADDRESS:   6100 Tower Circle, Suite 100 | |
| Franklin, TN 37067 | |
| | ADDRESS:   166 Boulder Drive |
| | Fitchburg, MA 01420 |
| | |
| **Plaintiff Attorney:** ⌄   Jonathan M. Silverstein | **Defendant Attorney** ⌄ |
| ADDRESS:   Blatman, Bobrowski, Haverty & Silverstein | ADDRESS: |
| 9 Damonmill Square, Suite 4A4 | |
| Concord, MA 01742 | |
| BBO:   630431 | BBO: |
| **Plaintiff Attorney:** ⌄ | **Defendant Attorney** ⌄ |
| ADDRESS: | ADDRESS: |
| | |
| | |
| BBO: | BBO: |

| | | |
|---|---|---|
| | Add Parties | Remove Pa |

### TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| AC1 | Action involving Municipality - Real Property | A | ◉ YES   ○ NO |

*If "Other" please describe:

| Is there a claim under G.L. c. 93A? | Is there a class action under Mass. R. Civ. P. 23? |
|---|---|
| ○ YES  ◉ NO | ○ YES  ◉ NO |

### STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money dam (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

#### TORT CLAIMS

A. Documented medical expenses to date

    1. Total hospital expenses

    2. Total doctor expenses

    3. Total chiropractic expenses

    4. Total physical therapy expenses

    5. Total other expenses (describe below)

                                     Subtotal (1-5):   $0.00

B. Documented lost wages and compensation to date

C. Documented property damages to date

D. Reasonably anticipated future medical and hospital expenses

E. Reasonably anticipated lost wages

F. Other documented items of damages (describe below)

                                     TOTAL (A-F):   $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

#### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|

| 1. | |
|---|---|
| | Total |

Add Claim    Delete C

Signature of Attorney/Self-Represented Plaintiff: X                    Date:

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION UNDER S.J.C. RULE 1:18(5)**

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clien court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney: X   /s/ Jonathan M. Silverstein                    Date:   August 30, 202

SC0001: 02/24                    www.mass.gov/courts                    Date/Time Printed:08-22-2024 1

# CIVIL ACTION COVER SHEET INSTRUCTIONS —
# SELECT A CATEGORY THAT BEST DESCRIBES YOUR CASE*

**AC Actions Involving the State/Municipality †**

AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc.    (A)
AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc.    (A)
AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc.    (A)
AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. (A)

**CN Contract/Business Cases**

A01 Services, Labor, and Materials    (F)
A02 Goods Sold and Delivered    (F)
A03 Commercial Paper    (F)
A04 Employment Contract    (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract    (F)
A08 Sale or Lease of Real Estate    (F)
A12 Construction Dispute    (A)
A14 Interpleader    (F)
BA1 Governance, Conduct, Internal Affairs of Entities    (A)
BA3 Liability of Shareholders, Directors, Officers, Partners, etc.    (A)
BB1 Shareholder Derivative    (A)
BB2 Securities Transactions    (A)
BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property    (A)
BD2 Proprietary Information or Trade Secrets    (A)
BG1 Financial Institutions/Funds    (A)
BH1 Violation of Antitrust or Trade Regulation Laws    (A)
A99 Other Contract/Business Action - Specify (F)

\* See Superior Court Standing Order 1-88 for an explanation of the tracking deadlines for each track designation: F, A, and X. On this page, the track designation for each case type is noted in parentheses.

† Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

‡ Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

D01 Specific Performance of a Contract    (A)
D02 Reach and Apply    (F)
D03 Injunction    (F)
D04 Reform/ Cancel Instrument    (F)
D05 Equitable Replevin    (F)
D06 Contribution or Indemnification    (F)
D07 Imposition of a Trust    (A)
D08 Minority Shareholder's Suit    (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting    (A)
D11 Enforcement of Restrictive Covenant    (F)
D12 Dissolution of a Partnership    (F)
D13 Declaratory Judgment, G.L. c. 231A    (F)
D14 Dissolution of a Corporation    (F)
D99 Other Equity Action    (F)

**PA Civil Actions Involving Incarcerated Party ‡**

PA1 Contract Action involving an Incarcerated Party    (A)
PB1 Tortious Action involving an Incarcerated Party    (A)
PC1 Real Property Action involving an Incarcerated Party    (F)
PD1 Equity Action involving an Incarcerated Party    (F)
PE1 Administrative Action involving an Incarcerated Party    (F)

**TR Torts**

B03 Motor Vehicle Negligence - Personal Injury/Property Damage    (F)
B04 Other Negligence - Personal Injury/Property Damage    (F)
B05 Products Liability    (A)
B06 Malpractice - Medical    (A)
B07 Malpractice - Other    (A)
B08 Wrongful Death - Non-medical    (A)
B15 Defamation    (A)
B19 Asbestos    (A)
B20 Personal Injury - Slip & Fall    (F)
B21 Environmental    (F)
B22 Employment Discrimination    (F)
BE1 Fraud, Business Torts, etc.    (A)
B99 Other Tortious Action    (F)

**RP Summary Process (Real Property)**

S01 Summary Process - Residential    (X)
S02 Summary Process - Commercial/ Non-residential    (F)

**RP Real Property**

C01 Land Taking
C02 Zoning Appeal, G.L. c. 40A
C03 Dispute Concerning Title
C04 Foreclosure of a Mortgage
C05 Condominium Lien & Charges
C99 Other Real Property Action

**MC Miscellaneous Civil Action**

E18 Foreign Discovery Proceeding
E97 Prisoner Habeas Corpus
E22 Lottery Assignment, G.L. c. 10, § 28

**AB Abuse/Harassment Prevention**

E15 Abuse Prevention Petition, G.L. c. 209A
E21 Protection from Harassment, G.L. c. 258

**AA Administrative Civil Action**

E02 Appeal from Administrative Agency, G.L. c. 30A
E03 Certiorari Action, G.L. c. 249, § 4
E05 Confirmation of Arbitration Awards
E06 Mass Antitrust Act, G.L. c. 93, § 9
E07 Mass Antitrust Act, G.L. c. 93, § 8
E08 Appointment of a Receiver
E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A
E10 Summary Process Appeal
E11 Worker's Compensation
E16 Auto Surcharge Appeal
E17 Civil Rights Act, G.L. c.12, § 11H
E24 Appeal from District Court Commitment, G.L. c.123, § 9(b)
E94 Forfeiture, G.L. c. 265, § 56
E95 Forfeiture, G.L. c. 94C, § 47
E99 Other Administrative Action
Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B
Z02 Appeal Bond Denial

**SO Sex Offender Review**

E12 SDP Commitment, G.L. c. 123A, § 12
E14 SDP Petition, G.L. c. 123A, § 9(b)

**RC Restricted Civil Actions**

E19 Sex Offender Registry, G.L. c. 6, § 178M
E27 Minor Seeking Consent, G.L. c.112, § 1

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|

| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES | ☐ NO |

## STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF —** On the face of the Civil Action Cover Sheet (or on attached additional sheets, if necessary), the plaintiff s
state the facts on which the plaintiff relies to determine money damages. A copy of the completed Civil Action Cover Sheet, including th
statement concerning damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, exce
otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT —** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defend
file with the defendant's answer a statement specifying the potential damages which may result if the plaintiff prevails.

### A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
### IF THIS COVER SHEET IS NOT FILLED OUT THOROUGHLY AND
### ACCURATELY, THE CASE MAY BE DISMISSED.

Save as PDF

Reset F

*--No more pages!--*