# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ACADIA HEALTHCARE COMPANY, INC., and HABIT OPCO, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> CITY OF FITCHBURG, FITCHBURG ACTING BUILDING COMMISSIONER FELIX ZEMEL, CITY OF FITCHBURG ZONING BOARD OF APPEALS, and its members LAUREN McNAMARA, MICHAEL O'LAUGHLIN, CHRISTINE TREE, BRIAN GALLAGHER, and GREG BABINEAU, <br><br> *Defendants*. | Civil Action No. 24-cv-40162-MRG |

## <u>ORDER ON DEFENDANT'S MOTION TO DISMISS (ECF No. 14)</u>

**GUZMAN, J.**

Plaintiffs Acadia Healthcare Company, Inc. and Habit Opco, LLC (collectively, "Plaintiffs") bring this action against the City of Fitchburg (the "City"); Fitchburg Acting Building Commissioner Felix Zemel; the City of Fitchburg Zoning Board of Appeals (the "ZBA"); and ZBA members Lauren McNamara, Michael O'Laughlin, Christine Tree, Brian Gallagher, and Greg Babineau (collectively, "Defendants"), alleging various violations of federal and state law arising out of the denial of Plaintiffs' applications to renovate and relocate their substance abuse treatment facility within the City. Pending before the Court is Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [ECF No. 14]. For the reasons that follow, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

1

I.    **BACKGROUND**

This action arises from two permit denials by the City and its officials relating to a substance abuse treatment facility operated by the Plaintiffs. [ECF No. 13 ("SAC") ¶¶ 1-2].

Acadia Healthcare Company, Inc. ("Acadia") is a national healthcare company that provides counseling and medication-assisted treatment ("MAT") for individuals recovering from opioid use disorder ("OUD"). [SAC ¶ 16]. Acadia operates over 250 similar facilities across the country, including 16 in Massachusetts. [SAC ¶ 21]. Since 2001, Acadia has operated a counseling and treatment facility in Fitchburg at 155 Airport Road (the "Airport Road Site"). [SAC ¶ 20]. Acadia provides medically supervised treatment and counseling to patients recovering from opioid addiction on an outpatient basis. [SAC ¶ 17]. Acadia's model incorporates a team of medical professionals, including physicians, therapists, and clinicians who examine, test, counsel, and treat patients on site. [SAC ¶ 19]. There is no record of traffic or law enforcement problems relating to Acadia's operations within the City, nor is there any record of any problem with the ability of Acadia's patients to exit its facility during any alarm or other emergency. [SAC ¶ 22].

Beginning in 2018, policymakers of the City began exploring ways to adopt zoning amendments that would target substance abuse treatment facilities. [SAC ¶ 20]. During a meeting of the City's Planning Board[1] in January 2019, the City's Planning Director discussed zoning amendments "to be able to have controls on substance abuse clinics, methadone clinics, supervised injection sites, etc." [SAC ¶ 21]. The Planning Board voted to initiate such a zoning amendment. [SAC ¶ 21]. During its March 2019 meeting, the Planning Board discussed

---

[1] The Planning Board is charged with initiating and recommending proposed zoning amendments pursuant to Mass. Gen. Laws ch. 40A, § 5. [SAC ¶ 26].

"options" to regulate treatment facilities and made it clear that it did not want to "make other medical/dental offices harder to get approved." [SAC ¶ 22].

At its meeting the following month, the Planning Board voted to draft a zoning amendment explicitly defining substance abuse treatment facilities and targeting such facilities with discriminatory zoning requirements by prohibiting them throughout most of the City, allowing them only by special permit in the City's Medical Marijuana Overlay District, and imposing onerous buffer zone requirements. [SAC ¶ 23]. However, the Planning Board was advised by the City Solicitor that this approach would be too obviously discriminatory. [SAC ¶ 24]. Therefore, during the Planning Board's meeting in July 2019, "[i]t was suggested that the Use Table could be amended to allow other types of medical offices (ex. Dentist, physician, ophthalmologist, etc.) by right, but all other medical uses would be by special permit." [SAC ¶ 24]. The Planning Board supported this approach and voted to "recommend against any amendment that requires all medical uses to obtain a Special Permit." [SAC ¶¶ 24-25].

On March 16, 2021, the City Council voted to approve an amendment to a zoning ordinance that treats "medical treatment centers" far more restrictively than "medical offices." [SAC ¶ 27]. The zoning amendment was signed and approved by the Mayor. [SAC ¶ 28]. Upon information and belief, both the Mayor and members of the City Council were aware that the purpose of amending the Zoning Ordinance to require a special permit for certain medical uses was to allow the City to regulate or prohibit substance abuse treatment facilities. [SAC ¶ 29].

In late 2020 or early 2021, but in any event after the City began exploring the zoning amendment, Acadia approached City officials to discuss its intent to relocate its treatment facility within Fitchburg from the Airport Road Site to 370 Lunenburg Street (the "Lunenburg Street Site"). [SAC ¶¶ 20, 30]. Acadia's lease of the Airport Road Site was soon to expire, and Acadia

desired to relocate the facility to a location that was more convenient, accessible, comfortable, and modern, in order to better serve its patients. [SAC ¶ 31].

Acadia would be one of multiple tenants in an existing medical building containing approximately 18,830 square feet of gross floor area, set far back from the street. [SAC ¶ 32]. Other tenants at the property include Quest Diagnostics, a medical laboratory that provides clinical testing services to patients, and UMass Memorial Health, which provides various medical services, counseling, treatment, and medical care. [SAC ¶ 33]. Within a few months after Acadia informed the City of its intention to relocate to the Lunenburg Street Site, the City Council voted to adopt the amended zoning ordinance (the "Zoning Ordinance"), which for the first time required Acadia to obtain a special permit to operate a medical treatment center. [SAC ¶ 34].

On or about April 9, 2021, Acadia filed an application for a special permit to operate its clinic at the Lunenburg Street Site. [SAC ¶ 35]. No City department or board submitted any comments to the ZBA expressing concerns regarding traffic or purported security problems regarding the proposed use of the Lunenburg Street Site. [SAC ¶ 36]. At no time prior to the public hearing did any City official advise Acadia that traffic was a concern. [SAC ¶ 36]. The Lunenberg Site had a few lawfully preexisting zoning nonconformities. [SAC ¶ 42]. Upon information and belief, the City has never taken any enforcement action in connection with any medical use of the property based upon these zoning nonconformities. [SAC ¶ 42].

The public hearing before the ZBA commenced on May 11, 2021, and was continued to June 8, 2021, when the public hearing was closed. [SAC ¶ 46]. During the course of the public hearing, the ZBA accepted and expressed agreement with and support for numerous comments from neighbors, other tenants of the property, and City officials expressing overtly prejudiced

4

and discriminatory views, including "concerns" regarding increased crime and other misbehavior of patients seeking treatment at the facility. [SAC ¶ 47]. Other commenters noted that the Lunenburg Street Site is at the "gateway" of the City (on the boundary with the neighboring Town of Lunenburg) and questioned what kind of "message" it would send to have Acadia's clinic located on the municipal boundary. [SAC ¶ 48]. One of the most outspoken speakers expressing such discriminatory views was a member of the City Council, who was also the son of the Mayor. [SAC ¶ 50]. After the first hearing session, the City Solicitor was informed of the discriminatory statements and conduct of members of the ZBA and other City Officials and was asked to intervene. [SAC ¶ 51]. Upon information and belief, the Mayor knew of and supported the discriminatory statements and actions of City officials. [SAC ¶ 52].

During the course of the public hearing, members of the ZBA (including its chair), the City Council (including the son of the then Mayor), and others repeatedly demanded that Acadia justify its desire to relocate from the Airport Road Site. [SAC ¶ 53]. There is no requirement in the Zoning Ordinance or any other regulation that requires an applicant to justify its reasons for seeking to relocate a business. [SAC ¶ 53]. Upon information and belief, such demands are not made of any other special permit applicants. [SAC ¶ 53].

Acadia demonstrated why it sought to relocate, indicating that the proposed facility comprised an improvement in interior area, including handicap accessible square footage. [SAC ¶¶ 54-57]. Acadia also explained that renovations would be required at the Airport Road Site to make it more efficient and handicap accessible, resulting in the loss of usable square footage. [SAC ¶ 58]. The Airport Road location provided four stations for dispensing medication, lacking appropriate privacy enclosures for patients, whereas the facility at the Lunenburg Street Site would have provided six stations, each with appropriate privacy enclosures. [SAC ¶ 59].

5

Additionally, the Airport Road Site contains only one safe for storage of medication, without room to install a second, whereas the new facility at the Lunenburg Street Site would contain two safes for adequate medication storage. [SAC ¶ 60].

One of the most significant deficiencies in the Airport Road Site is the inadequacy of the patient waiting area. [SAC ¶ 61]. The existing patient waiting area is 688 square feet, and patients have often been required to queue outside, in public view and subject to inclement weather. [SAC ¶ 61]. The new facility would have allowed for a larger and more comfortable waiting area, and Acadia repeatedly agreed that it would accept a condition prohibiting outdoor queuing. [SAC ¶ 61]. Acadia further explained that the Airport Road Site had 16 staff offices, two or three of which would be lost as a result of required renovations, leaving 13 or 14 offices, whereas the proposed facility would have contained 24 offices for staff and patient counseling, and the entire facility would have been on one level, so that patients with limited mobility would not be forced to use a wheelchair lift to access their treatment. [SAC ¶ 62].

Nevertheless, the ZBA voted unanimously at the close of the public hearing to deny Acadia's Application. [SAC ¶ 63]. The ZBA's Decision (the "Decision") was filed with the City Clerk on or about August 31, 2021. [SAC ¶ 64]. The Decision states: "During both meetings, the Board received numerous comments via emailed letters and virtual participation, from neighbors, public officials, and medical professionals currently practicing at the Locus expressing their concern regarding this petition since this is a property bounded with residential neighborhoods on two sides. Objects included perceived safety, increased traffic, impaired driving, queuing, an influx of activity conflicting with the residential neighborhood, and visual impact on the City's commercial corridor." [SAC ¶ 65].

Acadia commissioned a substantial traffic study, the findings of which were presented to the ZBA as part of its application, and its traffic engineer was present during the public hearing to address any questions regarding perceived traffic issues. [SAC ¶ 67]. Acadia's proposal would not have resulted in any appreciable traffic impacts. [SAC ¶ 69]. The ZBA ignored the findings of the traffic consultant, even though it failed to solicit or receive any traffic comments from an independent traffic consultant or the City's engineering or public safety departments. [SAC ¶ 70].

The Decision also states: "In addition, several physicians practicing at the Locus, although valuing the services provided by the Petitioner, expressed concern about the proposed co-location of a medical treatment center, citing interactions with their patients, the effect of perceived safety issues on patient retention, difficulty in recruiting and retaining physicians to that location affecting continuation of medical services, and the proximity of a medical treatment center to a marijuana retailer." [SAC ¶ 71].

In addition to its request for a special permit, Acadia's submission to the ZBA explicitly requested a reasonable accommodation pursuant to the ADA and the Fair Housing Amendments Act. [SAC ¶ 73]. The ZBA failed even to address Acadia's request for reasonable accommodations. [SAC ¶ 74].

As a result of the Decision, Acadia was precluded from relocating to the Lunenburg Street Site. [SAC ¶ 75]. Acadia therefore renewed its lease at the Airport Road Site, seeking to invest its resources in renovating the facility. [SAC ¶¶ 75, 76]. On or about January 29, 2024, Acadia applied for a building permit to conduct interior renovations to its facility intended to increase its accessibility, comfort, and efficiency. [SAC ¶ 83]. On or about February 16, 2024, the Building Commissioner asked Acadia for "an explanation as to how this does not classify as

a Use Group B Ambulatory Care Facility." [SAC ¶ 84].[2] The Building Commissioner also suggested that Acadia would be required to obtain a special permit from the ZBA, even though Acadia had operated its clinic at the Airport Road Site since prior to the amended Zoning Ordinance. [SAC ¶ 85].

On February 19, 2024, Acadia's Architect responded, "The patients at this facility are not rendered incapable of self-preservation. Hence, this facility would not be categorized as an ambulatory care facility." [SAC ¶ 88]. On or about February 23, 2024, Acadia's Regional Vice President further responded to the Building Commissioner's request, explaining that the MAT services provided at the clinic do "not render persons incapable of self-preservation by our services and furthermore, the facility does not assume the responsibility for the care of incapable individuals." [SAC ¶ 89]. No reply was received from the Building Commissioner for over two months. [SAC ¶ 90].

Acadia subsequently engaged legal counsel, who issued a third written response, dated April 30, 2024, again explaining that, since none of Acadia's patients are incapacitated or incapable of self-preservation either when they arrive at the facility or as a result of their treatment, the clinic cannot be considered an Ambulatory Care Facility. [SAC ¶ 91]. He also explained that no special permit could be required, since Acadia was not proposing to change or expand its preexisting nonconforming use. [SAC ¶ 91]. Again, the Building Commissioner provided no response for over a month. [SAC ¶ 92].

Finally, on June 5, 2024, the Building Commissioner issued a decision denying Acadia's application ("Building Commissioner's Decision"). [SAC ¶ 93]. The Building Commissioner's

---

[2] Pursuant to Section 202 of the Massachusetts Building Code, Ambulatory Care Facilities are defined as, "Buildings or portions thereof used to provide medical, surgical, psychiatric, nursing or similar care on a less than 24-hour basis to individuals who are rendered incapable of self-preservation." [SAC ¶ 87].

Decision was based solely upon a determination that the Clinic is an Ambulatory Care Facility. [SAC ¶ 95]. It did not acknowledge or address Acadia's multiple submissions regarding the issue and provided no basis for the determination that Acadia's clinic constitutes an Ambulatory Care Facility. [SAC ¶ 96]. The Building Commissioner likewise ignored Acadia's request for reasonable accommodations in denying its request for a building permit for the renovation project. [SAC ¶ 107]. Acadia maintains that none of the counseling or treatment it provides "renders the patients incapable of taking action for self-preservation." [SAC ¶¶ 77-82, 101]. Patients are not sedated or put under general anesthesia at the clinic. [SAC ¶ 104]. They arrive and leave under their own power, generally within a matter of minutes. [SAC ¶ 104].

Acadia appealed the Building Commissioner's Decision to the state Building Code Appeals Board ("BCAB"). [SAC ¶ 108]. The BCAB held a public hearing on Acadia's appeal on September 5, 2024. [SAC ¶ 109]. During the BCAB hearing, the Building Commissioner offered no justification in support of his determination that Acadia's clinic constitutes an Ambulatory Care Facility. [SAC ¶ 110]. At the conclusion of the hearing, the BCAB unanimously voted to overturn the Building Commissioner's determination and to order issuance of the building permit. [SAC ¶ 112]. Despite the BCAB's vote, the Building Commissioner waited another month and a half before finally issuing a building permit on October 18, 2024, nearly nine months after Acadia first applied for the building permit. [SAC ¶ 113].

Plaintiffs filed suit in Worcester Superior Court on September 3, 2024. [ECF No. 10 at 1, 6]. The Complaint was thereafter amended on November 19, 2024. [ECF No. 10 at 6]. Defendants removed the action to this Court on December 23, 2024, [ECF No. 1], after which Plaintiffs filed their Second Amended Complaint. [ECF No. 13 ("SAC")]. Defendants filed the pending motion to dismiss on February 21, 2025. [ECF No. 14]. Plaintiffs filed their opposition

brief on March 22, 2025. [ECF No. 18]. With the leave of this Court, Defendants submitted a

reply brief on April 23, 2025. [ECF No. 22]. The motion to dismiss is now ripe for decision.

II.    **LEGAL STANDARDS**

A complaint "must provide 'a short and plain statement of the claim showing that the

pleader is entitled to relief.'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir.

2015) (quoting Fed. R. Civ. P. 8(a)(2)). But under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a defendant may move to dismiss an action arguing that it fails to state a claim upon

which relief can be granted. Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss, the complaint must state a claim that is plausible on its

face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, the "[f]actual

allegations must be enough to raise a right to relief above the speculative level, . . . on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555

(citations omitted). Dismissal is appropriate if the complaint fails to set forth "factual allegations,

either direct or inferential, respecting each material element necessary to sustain recovery under

some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting

Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).

On a motion to dismiss made pursuant to Rule 12(b)(6), the factual allegations in the

complaint are accepted as true, and the Court draws "all reasonable inferences in favor of the

plaintiff." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008) (citing

Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992)).

## III.    <u>DISCUSSION</u>

### A.    **Quasi-Judicial Immunity**

As a threshold matter, Defendants contend that the claims against the ZBA members in

their individual capacities are barred by quasi-judicial immunity. Quasi-judicial immunity is an

absolute immunity that extends "to agency officials who, irrespective of their <u>title</u>,

perform <u>functions</u> essentially similar to those of judges or prosecutors, in a setting similar to that

of a court." <u>Sinapi v. R.I. Bd. of Bar Examiners</u>, 910 F.3d 544, 554 (1st Cir. 2018) (quoting

<u>Bettencourt v. Bd. of Registration in Med. of Com. of Mass.</u>, 904 F.2d 772, 782 (1st Cir. 1990))

(emphasis in original). To determine the applicability of this type of immunity, the First Circuit

employs a functional approach involving a three-pronged inquiry:

> First, does a Board member, like a judge, perform a traditional "adjudicatory"
> function, in that he decides facts, applies law, and otherwise resolves disputes on
> the merits (free from direct political influence)? Second, does a Board member,
> like a judge, decide cases sufficiently controversial that, in the absence of absolute
> immunity, he would be subject to numerous damage actions? Third, does a Board
> member, like a judge, adjudicate disputes against a backdrop of multiple
> safeguards designed to protect [the complaining party's] rights?

<u>Bettencourt</u>, 904 F.2d at 782-83; <u>accord</u> <u>Diva's Inc. v. City of Bangor</u>, 411 F.3d 30, 41 (1st Cir.

2005).

Another session of this Court has held that zoning board officials may invoke quasi-

judicial immunity in certain circumstances. <u>See</u> <u>Brockton Power LLC v. City of Brockton</u>, 948 F.

Supp. 2d 48, 65 (D. Mass. 2013) (citing <u>Dotzel v. Ashbridge</u>, 438 F.3d 320, 324, 327 (3d Cir.

2006)). There, the Court explained that "if a planning board were to deny a permit application

based on good-faith consideration of the applicant's submission, after a public hearing, and in a

reasoned decision setting forth the basis for the denial, it would be acting in a quasi-judicial

capacity and likely would be immune from liability[.]" <u>Id.</u> However, the Court ultimately found

that the defendants were not entitled to quasi-judicial immunity because their alleged conduct

was "plainly administrative in nature" instead of the adjudicatory acts triggering the immunity.
Id. at 65-66.

Applying the Bettencourt factors here, the Court finds that the ZBA members are entitled
to quasi-judicial immunity. First, the ZBA members performed a traditional adjudicatory
function. According to the SAC, the ZBA held two public hearings on Acadia's special permit
application; heard testimony from numerous stakeholders, including residents, City Councilors,
current tenants, and Acadia's representatives; received exhibits; deliberated on the matter; and
issued a written decision setting forth their reasoning. [SAC ¶¶ 46, 63-64]. This process mirrors
the judicial function of hearing evidence, applying relevant law, and resolving the dispute on its
merits. See Diva's Inc., 411 F.3d at 41.

Regarding whether the ZBA members were "free from direct political influence," the
First Circuit's analysis in Bettencourt makes clear that this factor examines whether board
members are subject to the control of political leaders, not whether they adopt or agree with
statements made by such leaders. See 904 F.2d at 783 (explaining that board members were free
from political influence because they "serve[] a set term (three years), and can be removed only
for cause"). Here, the ZBA members are appointed to five-year terms and can be removed only
for cause, requiring written charges and a public hearing. See Mass. Gen. Laws ch. 40A, § 12;
City of Fitchburg Bylaws ch. 181, § 9.21. In other words, the ZBA is an independent board, free
from political influence—as its members can only be removed from office for cause—that is
capable of independent adjudication, without any personal interest in the outcome of the case.
This structural independence satisfies the "free from direct political influence" requirement.

Plaintiffs argue that quasi-judicial immunity should not apply because the ZBA members
"welcomed, echoed and explicitly adopted the discriminatory statements of the City's political

leaders." [ECF No. 18 at 7]. However, this argument misunderstands the relevant inquiry. The question is not whether the ZBA members agreed with or incorporated statements from political leaders into their decision, but rather whether they were subject to the direct control of those leaders. The First Circuit's decision in <u>Bettencourt</u> focused on structural safeguards such as set terms and removal only for cause, not on the content of the board's decision-making. <u>See</u> 904 F.2d at 783. Here, the ZBA members possessed the same structural independence identified as crucial in Bettencourt.

Second, the ZBA members' denial of the special permit application was sufficiently controversial to subject them to numerous damage actions in the absence of immunity. Indeed, this very case demonstrates that point, as Plaintiffs have sued the ZBA members both in their official and individual capacities seeking monetary damages. [SAC ¶ 10]. The controversy surrounding substance abuse treatment facilities, as evidenced by the public opposition described in the SAC, makes this the type of decision that would expose board members to repeated litigation absent immunity protection. [SAC ¶¶ 47-48].

Third, the ZBA adjudicated Acadia's application against a backdrop of multiple procedural safeguards. Massachusetts law provides aggrieved parties with a statutory right to appeal ZBA decisions to the Superior Court or Land Court under Mass. Gen. Laws. ch. 40A, § 17, with further appellate review available under Mass. Gen. Laws. ch. 211A, § 10. These procedural safeguards parallel those identified as sufficient in <u>Diva's Inc.</u>, where the First Circuit noted that the applicant could request written explanations for the denial and appeal to a board of appeals, with further recourse to state courts. 411 F.3d at 35, 41.

Plaintiffs attempt to distinguish this case by citing <u>Brockton Power</u>, arguing that immunity does not apply when board members act in bad faith and manufacture pretextual

reasons for denial. [ECF No. 18 at 7]. However, Brockton Power involved fundamentally

different allegations: the defendants there (1) summarily rejected a filing that other officials had

deemed acceptable, (2) withheld necessary information from the public and other board

members, and (3) prevented the plaintiff's representative from speaking at the public hearing.

948 F. Supp. 2d at 65-66. Here, by contrast, the SAC reflects that the ZBA held two public

hearings, allowed Acadia's representatives to speak and present evidence (including a traffic

study), and issued a written decision explaining their reasoning. [SAC ¶¶ 46, 63-64, 67]. These

allegations fall far short of the procedural irregularities that precluded immunity in Brockton

Power. Moreover, Plaintiffs' allegations of discriminatory intent and bad faith, while serious, do

not automatically defeat quasi-judicial immunity. The First Circuit has recognized that zoning

boards making controversial decisions must be protected from damage suits based on

disagreement with their rulings. See Diva's Inc., 411 F.3d at 41. The immunity would be

meaningless if it could be defeated merely by alleging that the board acted with improper

motivations. Accordingly, the ZBA members are entitled to quasi-judicial immunity, and all

claims against them in their individual capacities must be dismissed.

### B.    Statute of Limitations

Next, Defendants maintain that Counts I-III should be dismissed because they are time-

barred. For federal causes of action, like Plaintiffs' claims under the ADA, the Rehabilitation

Act, and Section 1983, courts generally look to the state in which the action arose and borrow

that state's statute of limitations, usually for personal injury torts. Nieves-Marquez v. Puerto

Rico, 353 F.3d 108, 118-19 (1st Cir. 2003). Massachusetts provides a three-year statute of

limitations for personal injury claims. Mass. Gen. Laws ch. 260, § 2A. While the length of the

statute of limitations is based on state law, "[f]ederal law determines the date on which the

statute of limitations begins running." <u>Marrero-Gutierrez v. Molina</u>, 491 F.3d 1, 5 (1st Cir. 2007). Ordinarily, under federal law, a claim accrues when a plaintiff learns of or has reason to know of the alleged injury. <u>See id.</u>; <u>Burns v. City of Worcester</u>, 772 F. Supp. 3d 109, 127-28 (D. Mass. 2025). A plaintiff is considered to know or have reason to know of the injury on which the action is based "at the time of the act itself and not at the point that the harmful consequences are felt." <u>Moran Vega v. Cruz Burgos</u>, 537 F.3d 14, 20 (1st Cir. 2008) (quoting <u>Marrero-Gutierrez</u>, 491 F.3d at 6).

In the instant case, the original complaint was filed in Worcester Superior Court on September 3, 2024, meaning that August 31, 2021, was the earliest date Plaintiffs' claims could have accrued. In Defendants' view, Plaintiffs' claims are time-barred because, even though the ZBA did not file its decision with the City Clerk until August 31, 2021, Acadia was made aware of the denial of its petition on June 8, 2021, when the ZBA voted against the petition at the conclusion of its second of two public hearings. [ECF No. 15 at 8-9]. While this may be true, Defendants seemingly neglect to consider that the decision only became final when the ZBA filed its decision with the City Clerk. <u>Bd. of Aldermen of Newton v. Maniace</u>, 711 N.E.2d 565, 568 (Mass. 1999) ("The filing of the board's decision in the office of the municipal clerk constitutes 'final action' as that term is used in § 9."); Mass. Gen. Laws ch. 40A, § 9 ("Failure by the special permit granting authority to take final action within said ninety days or extended time, if applicable, shall be deemed to be a grant of the special permit."). This consideration is crucial because Section 1983 claims in the zoning context typically do not accrue until the administrative decision becomes final and enforceable.

The First Circuit has held that a claim accrues when the plaintiff has a "complete and present cause of action" — that is, when the plaintiff "can file suit and obtain relief." <u>Ouellette v.</u>

Beaupre, 977 F.3d 127, 135 (1st Cir. 2020) (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)).

In the zoning context, this principle aligns with the requirement that administrative processes

must reach finality before federal constitutional challenges can proceed. Until the ZBA's

decision was filed with the City Clerk on August 31, 2021, there was no final, enforceable

decision for Plaintiffs to challenge. The June 8, 2021 vote merely represented the ZBA's

preliminary determination, but under Massachusetts law, the decision had no legal effect until

properly filed pursuant to Mass. Gen. Laws ch. 40A, § 9.[3]

Moreover, Massachusetts courts have consistently treated the filing with the municipal

clerk as the triggering event for appeal deadlines under the Zoning Act. E.g., Allegaert v. Harbor

View Hotel Owner LLC, 180 N.E.3d 459, 464 (Mass. App. Ct. 2021) (explaining that pursuant

to Mass. Gen. Laws ch. 40A, § 17, a person aggrieved by a decision on a special permit may

only appeal after a decision has been filed in the office of the city or town clerk). In other words,

Plaintiffs could not have had a "complete and present cause of action" until the ZBA took final

action by filing its decision with the municipal or town clerk. Additionally, Plaintiffs alleged that

they requested reasonable accommodations under the ADA and Rehabilitation Act, but the ZBA

"failed even to address Acadia's request for reasonable accommodations." [SAC ¶ 74]. Until the

written decision was filed, Plaintiffs could not know with certainty whether the ZBA would

address their accommodation requests in its final decision. The failure to respond to a request for

reasonable accommodation is a separate basis for liability under the ADA and Rehabilitation

Act, and this claim could not have accrued until the ZBA's silence on the matter became final

through the filing of its decision.[4]

---

[3] In fact, had the ZBA not filed its decision with the City Clerk within the allowable time, Acadia's petition would
have been deemed constructively granted. Mass. Gen. Laws ch. 40A, § 9.
[4] In any event, Defendants concede that Plaintiffs' claim under the ADA is not time-barred. [ECF No. 22 at 6 n.3].

Accordingly, Plaintiffs' claims based on the ZBA's 2021 decision accrued on August 31, 2021, when the decision was filed with the City Clerk, and are therefore timely filed within the three-year limitations period. Defendants' motion to dismiss on statute of limitations grounds should be denied.

### C.    Counts I and II: Violations of the ADA and Rehabilitation Act

At Counts I and II, Plaintiffs allege that the denial of their petitions constituted unlawful discrimination in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. [SAC ¶¶ 121-33]. The claims are brought only against the City of Fitchburg. [ECF No. 15 at 9 n.5].[5] Although the ADA and the Rehabilitation Act have some differences, in some cases, their "points of departure have no bearing." Partelow v. Massachusetts, 442 F. Supp. 2d 41, 47 (D. Mass. 2006). Accordingly, "identical claims brought pursuant to the ADA and Rehabilitation Act are subject to the same analysis." Smith v. Pub. Schs. of Northborough-Southborough, 133 F. Supp. 3d 289, 295 (D. Mass. 2015) (citing Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004)). In accordance with the approach taken in the First Circuit, the Court will construe Counts I and II as presenting a single claim and, unless otherwise noted, will examine them without further distinction. Parker v. Univ. de P.R., 225 F.3d 1, 4 (1st Cir. 2000); see Decotiis v. Whittemore, 842 F. Supp. 2d 354, 371-72 (D. Me. 2012) (recognizing that separate analysis for Rehabilitation Act claim is unnecessary when ADA claim is being considered on the same grounds).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such

---

[5] Indeed, Title II expressly applies to any "public entity," 42 U.S.C. § 12132, which is defined to mean any "State or local government," id. § 12131(1)(A).

entity." Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 144 (1st Cir. 2014) (quoting 42 U.S.C. §

12132). In reading Title II, the First Circuit has said that to state an actionable reasonable

accommodation claim, a plaintiff must establish "(1) that he is a qualified individual with a

disability; (2) that he was either excluded from participation in or denied the benefits of some

public entity's services, programs, or activities or was otherwise discriminated against; and (3)

that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's

disability." Parker, 225 F.3d at 5; accord Doe v. R.I. Interscholastic League, 137 F.4th 34, 40

(1st Cir. 2025). A plaintiff seeking to satisfy this standard may base a Title II claim on any of

three theories of liability: disparate treatment or intentional discrimination, disparate impact, or

failure to make a reasonable accommodation. Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 30-31

(1st Cir. 2023). Plaintiffs allege that they have stated a viable claim under all three kinds of

unlawful discrimination. [ECF No. 18 at 9-13].

    Before addressing the theories of discrimination advanced by Plaintiffs, there is no

question that individuals recovering from or receiving treatment for addiction are qualified

individuals with a disability for purposes of the ADA. 28 C.F.R. § 35.108(b)(2) ("Physical or

mental impairment includes, but is not limited to, . . . drug addiction[.]"); see Jones v. City of

Boston, 752 F.3d 38, 58 (1st Cir. 2014) (holding in the context of an employment claim that

"[i]ndividuals who are recovering from an addiction to drugs may be disabled in the meaning of

the ADA, as the statute aims to protect them from the stigma associated with their addiction"). A

treatment provider, such as Plaintiffs, has standing to sue on their own behalf when "denied a

zoning permit because it cares for and/or associates with individuals who have disabilities." CRC

Health Grp., Inc. v. Town of Warren, No. 2:11-cv-196-DBH, 2014 WL 2444435, at *8 (D. Me.

Apr. 1, 2014) (quoting MX Grp., Inc. v. City of Covington, 293 F.3d 326, 335 (6th Cir. 2002));

accord Metro Treatment of Me., LP v. City of Bangor, No. 1:16-cv-00433-JAW, 2016 WL
6768929, at *7 (D. Me. Nov. 15, 2016). Moreover, Defendants do not dispute that Plaintiffs'
patients were either excluded from participation in, or denied the benefits of, a public entity's
services, programs, or activities. Instead, the focus of Defendants' argument is that the causation
element is not met. [ECF No. 15 at 9].

### 1.    Intentional Discrimination

Plaintiffs claim that the ZBA acted with overt discriminatory intent when it denied their
petition to relocate to the Lunenberg Street Site and, after such petition was denied, when the
Building Commissioner denied their request for a building permit to renovate their current
facility at the Airport Road Site. [SAC ¶¶ 121-33]. Claims brought under an intentional
discrimination theory, also often referred to as disparate treatment theory, require "that the
disability actually motivated the defendant's challenged adverse conduct." Nunes, 766 F.3d at
144-45. Intentional discrimination can be proven "either by direct evidence of discriminatory
intent, or [indirectly] by the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802 (1973)." Tassinari v. Salvation Army, No. 21-10806-LTS, 2024 WL 5497943, at *12
(D. Mass. Mar. 28, 2024) (collecting cases).[6] Direct evidence is that which "unambiguously
implicates a [disability] discrimination motive" and "consists of statements by a decisionmaker
that directly reflect the alleged animus and bear squarely on the contested . . . decision." Patten v.
Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir. 2002). For a statement to constitute direct
evidence, it must give a "high degree of assurance" that the decision in question "was
attributable to discrimination." Id. However, "[a] statement that can plausibly be interpreted two

---

[6] In the absence of direct evidence of discrimination, a plaintiff may prove discrimination circumstantially by
satisfying the three requirements of the McDonnell Douglas burden-shifting analysis. Neither of the parties engage
in this framework.

different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." Id. Direct evidence, while not an insurmountable burden, is "relatively rare." Id.

Plaintiffs point to a handful of allegations they claim reflect Defendants' discriminatory intent. [ECF No. 18 at 10-11]. As an initial matter, whatever City officials did or said prior to the enactment of the Zoning Ordinance—namely, actions predating Plaintiff's petitions—cannot be said to bear on the ZBA's and Building Commissioner's ultimate decisions. See [ECF No. 18 at 10-11 (noting that City officials stated proposed ordinance was intended to target addiction treatment facilities, that the proposal was revised to appear facially neutral, and that City officials maintained that revised proposal should not be construed as regulating any providers other than addiction treatment facilities)]; Nunes, 766 F.3d at 144-45 (relevant inquiry requires a plaintiff to demonstrate that the decision in question was motivated by an improper animus). Indeed, the basis for the claim is the adjudication of the petitions. See generally [SAC]. As such, the allegations concerning the Zoning Ordinance are not actionable under Plaintiffs' theory of intentional discrimination.

Next, Plaintiffs point to statements that City and ZBA officials made in connection with Plaintiffs' petition to relocate to the Lunenberg Street Site. See [ECF No. 18 at 11]. According to the SAC, at the public hearing, "the ZBA accepted and expressed agreement with and support for numerous comments from neighbors, other tenants of the property, and City officials expressing overtly prejudiced and discriminatory views, including unfounded 'concerns' regarding increased crime and other misbehavior of patients seeking treatment at the facility." [SAC ¶ 47 (emphasis added)]. Direct evidence of discrimination exists in this case because the ZBA unequivocally tied the adjudication of Plaintiff's petition to impermissible disability

20

discrimination. More specifically, the ZBA admitted that Plaintiffs' petition raised safety concerns <u>arising from</u> the fact that Plaintiffs' facility treats patients with opioid use disorder. The ZBA's position cannot plausibly be interpreted in any other way. Indeed, some of the comments which the ZBA "accepted and expressed agreement with and support for" included concerns about "what kind of 'message' it would send to have Acadia's clinic located on the municipal boundary." [<u>SAC</u> ¶¶ 47, 48]. These allegations provide a "high degree of assurance" that the ZBA's decision to deny Plaintiffs' petition to relocate was attributable to disability discrimination. <u>See</u> <u>Patten</u>, 300 F.3d at 25.[7]

As it relates to the denial of their application for a building permit to renovate their facility at the Airport Road Site, Plaintiffs contend that the Building Commissioner's decision was based on the conclusion that Acadia's patients are incapable of self-preservation because they "are innately incapable of exiting the building without assistance in the event of an emergency simply because they are in recovery from OUD." [SAC ¶ 102]. The SAC further provides that the Building Commissioner reached that conclusion despite the fact that the Building Code "itself . . . recognizes that residents of alcohol and drug treatment facilities are indeed capable of preservation." [<u>Id.</u> ¶ 106 (citing 780 Mass. Code Regs. 310.6(1) ("The persons receiving care are capable of self-preservation. This group shall include, but not be limited to . . . [a]lcohol and drug centers[.]")). If the applicable state regulations consider Acadia's patients as individuals capable of self-preservation, the Building Commissioner's conclusion to the contrary suggest that it was a mere pretext. But without additional allegations, the Court cannot conclude

---

[7] Defendants contend that the comments of the public cannot be imputed or attributed to the ZBA or its members absent allegations that members of the public had power or influence over them. [ECF No. 15 at 11]. This contention misses the mark because the SAC alleges that the ZBA in fact made its own statements. [SAC ¶¶ 47-48]. When the ZBA makes its own statements, the issue is not imputation or attribution merely because the statements mirror public sentiment.

that an unlawful animus is directly reflected in the Building Commissioner's reasoning. See Patten, 300 F.3d at 25. Accordingly, Plaintiffs' intentional discrimination theory fails with respect to the Building Commissioner's denial of Plaintiff's application for a building permit.

### 2. Disparate Impact

Next, Plaintiffs maintain that while the Zoning Ordinance may appear facially neutral, its application has nevertheless improperly targeted addiction treatment facilities, exempting other types of medical providers. [ECF No. 18 at 12]. In order to state a viable disparate impact claim, a plaintiff must "1) identify the challenged employment practice or policy, and pinpoint the defendant's use of it; (2) demonstrate a disparate impact on a group characteristic . . . that falls within the protective ambit of [the ADA]; and (3) demonstrate a causal relationship between the identified practice and the disparate impact." Femino v. NFA Corp., 274 F. App'x 8, 10 (1st Cir. 2008) (citation modified). As the Court explained above, individuals recovering from or receiving treatment for addiction are deemed qualified individuals with a disability for purposes of the ADA. See infra. Plaintiffs therefore need only establish the second and third elements of the disparate impact inquiry. Defendants offer no argument. Nevertheless, the SAC gives the Court no basis to assess the constitutionality of the Zoning Ordinance. While the SAC alleges deeply concerning statements by the Planning Board in the lead up to the enactment of the Zoning Ordinance, the SAC fails to offer any allegations as to the content of the Zoning Ordinance itself. The SAC merely provides that "[o]n March 16, 2021, the City Council voted to approve a zoning amendment that treats 'medical treatment centers' far more restrictively than 'medical offices.'" [SAC ¶ 27]. Without some well-pleaded facts, that assertion cannot establish that the Zoning Ordinance brought about "a disparate impact on a group characteristic . . . that falls within the protective ambit of [the ADA]." See Femino, 274 F. App'x at 10; see also Nunes

v. Mass. Dep't of Corr., 766 F.3d 136, 145 (1st Cir. 2014) (explaining that disparate impact theory requires showing "a [ ] policy, though neutral on its face, 'fall[s] more harshly on one group than another and cannot be justified by business necessity.'"). Dismissal is therefore appropriate.

### 3.    *Reasonable Accommodation*

Finally, Plaintiffs contend that neither the ZBA nor the Building Commissioner considered in good faith their requests for reasonable accommodations. [ECF No. 18 at 13]. As outlined supra, the ADA requires "public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that the modifications would fundamentally alter the nature of the service, program, or activity.'" Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 283 (1st Cir. 2006) (quoting 28 C.F.R. § 35.130(b)(7)). Thus, to successfully plead a claim premised on the failure to provide a reasonable accommodation, a plaintiff must allege that "(1) due to the claimant's disability, he needs an individualized change to a public entity's facially neutral policies, practices, or procedures if he is to effectively access some opportunity; but (2) the public entity unjustifiably failed to make that change." Sosa, 80 F.4th at 31. Here, the SAC once again is devoid of any allegations sufficient to support Plaintiffs' theory. The SAC only indicates that, in addition to their permit applications, Plaintiffs likewise submitted to the ZBA and the Building Commissioner a request for reasonable accommodations pursuant to the ADA and the Fair Housing Amendments Act. [SAC ¶¶ 73, 107]. Neither request was addressed. [Id. ¶¶ 74, 107]. Although such conduct is troubling and supports a reasonable inference of bad faith, Plaintiffs neglect to put forth any allegation as to the nature of the accommodation requested and the reasonableness of such accommodation. Absent

more specific allegations, requiring the Court to draw the necessary inferences would exceed the bounds of proper inference-making. Accordingly, dismissal is appropriate as to this theory.

### D.    Count III: Municipal Liability

A city or other local government may be liable under Section 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation. Connick v. Thompson, 563 U.S. 51, 60 (2011) (citing Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 692 (1978)). However, under Section 1983, local governments are responsible only for "their own illegal acts" and may not be held "vicariously liable" for their employees' actions. Id. (citations omitted). Therefore, plaintiffs who seek to impose liability against local governments must prove that the "'action pursuant to official municipal policy' caused their injury." Id. Importantly, plaintiffs seeking recovery under Section 1983 must allege a "'constitutional injury,' that is, he or she must identify a deprivation of some federally secured right." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 55 (1st Cir. 2006) (citation omitted). Local governments are not vicariously liable under Section 1983 for their employees' actions. Monell, 436 U.S. at 691. However, they may be liable for constitutional violations under Section 1983 if the government body causes the plaintiff's injury by either a municipal policy or a municipal custom. Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 305 (D. Mass. 2017).

A Section 1983 claim based on a theory of municipal policy is only viable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690-91. "[A] single decision by [a] person with final policy-making authority may result in municipal liability under certain circumstances . . . . However, this single action 'must be taken by a municipal official with final policy-making authority in the relevant area of the city's

business.'" <u>Freeman v. Town of Hudson</u>, 849 F. Supp. 2d 138, 149 (D. Mass. 2012), <u>aff'd</u>, 714 F.3d 29 (1st Cir. 2013). The action constituting a municipal policy also "must be . . . the moving force behind the constitutional violation." <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1162 (1st Cir. 1989). At the motion to dismiss stage, "a complaint must provide support for a reasonable inference that an official has the requisite authority." <u>Freeman</u>, 849 F. Supp. 2d at 150 (recommending dismissal of municipal claims where complaint references no state or local laws establishing the policymaking authority of any individual or group of individuals); <u>accord</u> <u>Rinsky v. Tr. of Bos. Univ.</u>, No. 10cv10779-NG, 2010 WL 5437289, at *5 (D. Mass. Dec. 27, 2010) (dismissing municipal claim due to plaintiff's failure to provide the court with pertinent local or state laws, town charter, or procedural manuals to support inference that officials had final policy-making authority).

In order to establish a Section 1983 claim based on a theory of municipal custom, the plaintiff must allege actions that are "persistent and widespread discriminatory practices of state officials" which are "so permanent and well settled as to constitute a 'custom or usage' with the force of law," <u>Monell</u>, 436 U.S. at 690-91, such "that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice," <u>Baez v. Town of Brookline</u>, 44 F.4th 79, 82 (1st Cir. 2022). While a single incident "is insufficient, in and of itself, to establish a municipal custom or usage," "allegations of multiple instances of misconduct that suggest a systemic pattern of activity . . . may support an inference of a municipal custom." <u>Summers v. City of Fitchburg</u>, No. 23-cv-12849-ADB, 2024 WL 555815, at *8 (D. Mass. Feb. 12, 2024) (citation modified) (quoting <u>Doe v. Town of Wayland</u>, 179 F. Supp. 3d 155, 173 (D. Mass. 2016)). As with a municipal policy, "the custom must have been the cause of and the moving force behind the deprivation of constitutional rights." <u>Bordanaro</u>, 871 F.3d at 1156.

As an initial matter, there can be no municipal liability under Section 1983 without an underlying constitutional violation. Bannon v. Godin, 99 F.4th 63, 88 (1st Cir. 2024) (explaining that a "theory of municipal liability is only viable where a plaintiff establishes the existence of 'underlying, identifiable constitutional violations'" (quoting Lachance v. Town of Charlton, 990 F.3d 14, 31 (1st Cir. 2021)). Indeed, as discussed supra, Plaintiffs have failed to state a claim that a person, who is not entitled to absolute immunity, acted under the color of state law when they deprived Plaintiffs of a constitutional right. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) (explaining that, in order to succeed on a Section 1983 claim, a plaintiff must show that defendants acted under the color of state law, and that his or her conduct deprived plaintiff of rights secured by the Constitution or by federal law). Thus, Plaintiffs have failed to state an underlying constitutional violation sufficient to support a municipal liability claim, requiring dismissal of the claims against the City.

Even if, arguendo, Plaintiffs had succeeded at establishing an underlying constitutional violation, their municipal liability claims are defective for a number of reasons. As it relates to a municipal policy, to the extent Plaintiffs premise their claim based on the ZBA's denial of Acadia's special permit application, they fail to establish that the ZBA possesses final policymaking authority. See Freeman, 849 F. Supp. 2d at 150; Rinsky, 2010 WL 5437289, at *5. More specifically, the Second Amended Complaint alleges only that the ZBA "is a Board of the City established pursuant to M.G.L. c. 40A, § 12." [SAC ¶ 9]. This bare allegation, without more, fails to establish that the ZBA has final policymaking authority with respect to special

permit decisions.[8] In fact, the statutory provision Plaintiffs cite contains no reference to the ZBA's final policymaking authority. Rather, the provision addresses exclusively matters of board constitution, including composition, member appointment, and dismissal. Mass. Gen. Laws. ch. 40A, § 12. Plaintiffs have not otherwise provided any reference to any other state or local laws, the City's charter, or any other authority demonstrating that the ZBA possesses final policymaking authority such that its decisions can be attributed to the City as official policy. Without such allegations, the Court cannot infer that the ZBA's denial of Acadia's application constitutes municipal policy for purposes of Section 1983 liability. See Freeman, 849 F. Supp. 2d at 150; Rinsky, 2010 WL 5437289, at *5.

Plaintiffs' attempt to establish municipal custom fares no better. Plaintiffs allege that the City engaged in a pattern of discriminatory conduct against substance abuse treatment facilities, citing three incidents: the 2008 opposition to a facility at 199 Summer Street, [SAC ¶¶ 115-16]; the December 2023 denial to Spectrum Health Systems, [SAC ¶¶ 117-19]; and actions against Jeffrey's House over "many years," [SAC ¶ 120]. These scattered incidents over a sixteen-year period do not establish a "persistent and widespread" practice sufficient to constitute a municipal custom. See Summers, 2024 WL 555815, at *8. Critically, Plaintiffs identify no incidents between 2008 and 2021—a thirteen-year gap—during which the City allegedly engaged in discriminatory conduct. Three discrete incidents spanning nearly two decades, with years-long gaps between them, cannot plausibly suggest the "systemic pattern of activity" necessary to establish municipal custom. See Mahan, 64 F.3d at 16-17; Summers, 2024 WL 555815, at *9. And, Plaintiffs otherwise fail to allege facts demonstrating that the City's policymaking officials

---

[8] In fact, as further explained supra, Massachusetts law provides applicants with a statutory right to appeal ZBA decisions to the Superior Court or Land Court. See Mass. Gen. Laws. ch. 40A, § 17. The availability of this statutory appeal mechanism suggests that the ZBA's decisions are not final for purposes of municipal policymaking authority. See Freeman, 849 F. Supp. 2d at 149.

had actual or constructive knowledge of any alleged widespread practice yet did nothing to end it. See Baez, 44 F.4th at 82. The Second Amended Complaint contains only generalized allegations that certain officials were "aware" of discriminatory statements [SAC ¶¶ 51-52], but provides no factual basis to conclude that policymakers knew of and acquiesced in a persistent municipal custom of discrimination.

Accordingly, Plaintiffs' municipal liability claim must be dismissed.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss [ECF No. 14] is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

Dated: September 30, 2025

 _/s/ Margaret R. Guzman_____
Margaret R. Guzman
United States District Judge

28